IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| THE NORTHERN CHEYENNE TRIBE,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　Defendant. | CV 24-52-BLG-SPW-TJC<br><br>**FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE** |

Plaintiff The Northern Cheyenne Tribe (the "Tribe") brings this action against the United States, the Department of the Interior, the Bureau of Indian Affairs ("BIA"), the Secretary of the Interior, and other officials of the BIA (collectively the "United States") pursuant to the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 5301, et seq.  The Tribe challenges the United States' declination of the Tribe's proposed self-determination contract to assume operation of the BIA Office of Justice Services' law enforcement Program Management function within the Northern Cheyenne Reservation.

Presently before the Court are the Tribe's Motion for Summary Judgment (Doc. 33) and the United States' Motion for Summary Judgment (Doc. 37), which have been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B).  The motions are fully briefed and ripe for the Court's review.  On June 10, 2026, the

1

Court heard oral argument on the parties' motions.

Having considered the parties' submissions and arguments, the Court

**RECOMMENDS** the Tribe's motion be **GRANTED in part**, and the United

States' motion be **DENIED**.

## I.        STATUTORY BACKROUND

In 1975, Congress passed the ISDEAA to promote Indian tribes' desire for

self-determination.  The ISDEAA was designed to "permit an orderly transition

from the Federal domination of programs for, and services to, Indians to effective

and meaningful participation by the Indian people in the planning, conduct, and

administration of those programs and services."  25 U.S.C. § 5302(b).  Under the

ISDEAA, "a tribe that is receiving a particular service from the BIA may submit a

contract proposal to the BIA to take over the program and operate it as a contractor

and receive the money that the BIA would have otherwise spent on the program."

*Los Coyotes Band of Cahuilla & Cupeño Indians*, 729 F.3d 1025, 1033 (9th Cir.

2013).  Such contracts are often referred to as 638 contracts.  *Id.*

The ISDEAA permits the Secretary to decline a contract proposal if the

proposed funding exceeds the applicable funding level for the program.  25 U.S.C.

§ 5321(a)(2)(D).  Under the ISDEAA, the applicable funding level "shall not be

less than the appropriate Secretary would have otherwise provided for the

operation of the programs or portions thereof for the period covered by the

contract." *Id.* § 5325(a)(1). This funding level is known as the secretarial amount. The Ninth Circuit has commented that the ISDEAA "limits the amount of money that a tribe may obtain under a 638 contract to the amount that the BIA is currently spending on the program in existence for which the tribe seeks to obtain a contract to operate." *Los Coyotes*, 729 F.3d at 1033. But several courts have recognized that the secretarial amount sets a floor, not a ceiling, on the amount of money that an Indian tribe can receive in a self-determination contract. *See, e.g.*, *Yurok Tribe v. Dep't of the Interior*, 785 F.3d 1405, 1412 (Fed. Cir. 2015) (finding the government is not prohibited from funding a program for greater than the amount the government is currently spending); *Seneca Nation of Indians v. Dep't of Health & Hum. Servs.*, 945 F. Supp. 2d 135, 143 (D.D.C. 2013) ("The ISDEAA sets the Secretarial amount as a floor; tribes are able to negotiate for higher levels of funding").

Upon submission of a tribe's 638 contract proposal, the ISDEAA requires the Secretary to "approve the proposal and award the contract" within 90 days unless the Secretary makes a specific written finding that "clearly demonstrates" there is a statutory basis to reject the contract. 25 U.S.C. § 5321(a)(2); 25 C.F.R. § 900.29. The statutory grounds for declination are:

> (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

3

(B) adequate protection of trust resources is not assured;

(C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

(D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 5325(a) of this title; or

(E) the program, functions, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 5321(a)(2)(A)–(E).

The Secretary is also required to sever and approve any portion of a proposal that is allowable, even if some parts of the proposal cannot be approved. *Id.* § 5321(a)(4); 25 C.F.R. § 900.25. The Secretary is further required to negotiate in good faith at all times to maximize the policy of Tribal self-determination. 25 U.S.C. § 5321(f).

If the Secretary declines a 638 contract proposal, the Secretary must state any objections in writing to the tribe. *Id.* § 5321(b)(1). The Secretary's written notice must "explain the reasons for a declination; she may not rely on post-hoc justifications." *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 542 (D.D.C. 2014). *See also Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007) ("The law requires a detailed explanation of the Secretary's rationale for his decision and a disclosure of the facts or documents on

4

which he relied for his decision.").  The Secretary must also provide assistance to the tribe to overcome the stated objections, and must provide any necessary requested technical assistance to develop any modifications to overcome the Secretary's stated objections.  25 U.S.C. § 5321(b)(2); 25 C.F.R. § 900.30.

In addition, the Secretary must provide the tribe with a hearing and opportunity to file an administrative appeal.  25 U.S.C. § 5321(b); 25 C.F.R. § 900.31.  In lieu of filing such appeal, the tribe has the option to challenge the denial directly in federal district court.  *Id.*

If the tribe challenges the declination, "the Secretary shall have the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 5321(e)(1).  *See also N. Arapaho Tribe v. LaCounte*, 2017 WL 2728404, at *2 (D. Mont. June 23, 2017) (stating the ISDEAA specifically puts the burden of proof on the BIA to demonstrate the validity of the declination); *Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell*, 256 F. Supp. 3d 1186, (D.N.M. 2015) ("Courts faced with ISDEAA declination claims have thus required the Secretary to establish 'by clear and convincing evidence' the validity of the grounds of his or her declination").  Federal courts review the Secretary's declinations de novo.  *N. Arapaho Tribe*, 2017 WL 2728404, at *2; *Cheyenne River Sioux Tribe*, 496 F. Supp. 2d at 1066–67; *Navajo Health Found.-Sage Mem'l Hosp.*, 256 F. Supp. 3d at 1223.

## II.    FACTUAL BACKGROUND[1]

The Tribe is a federally recognized Indian tribe governing and occupying the Northern Cheyenne Reservation in southeastern Montana. (Doc. 42, ¶ 1.) The present action arises from the Tribe's efforts to assume control of various aspects of law enforcement on the Reservation through self-determination contracts.

Prior to 2020, the BIA operated all aspects of the law enforcement program on the Reservation, which appears to consist of the following program components: Uniform Police, Juvenile Corrections, Criminal Investigations, Telecommunications (including dispatch operations), and Program Management. (Doc. 44, ¶ 13.)

In August 2020, the Tribe submitted a proposal under the ISDEAA to contract for the Criminal Investigations component. (*Id.* ¶ 25.) The United States declined the proposal, and in December 2020, the Tribe brought an action in this Court alleging the declination violated the ISDEAA. (*Id.* ¶¶ 27–28.)

Separate from the Tribe's 2020 lawsuit, the Tribe passed Resolution No. DOI-044 on December 7, 2020, which expressed the Tribe's intent to contract for the Criminal Investigation unit, as well as the Program Management and Telecommunications components. (*Id.* ¶ 30; Doc. 40-1 at 1–2.)

---

[1] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment and are taken from the parties' submissions and are undisputed except where indicated.

6

On January 14, 2021, the Tribe sent a letter to the United States requesting a meeting to obtain technical assistance and information to support its anticipated proposal "to contract with the Bureau for the criminal investigation program within the Northern Cheyenne Reservation, as well as the program management and telecommunications programs/functions." (Doc. 39-2 at 3–5.)  Thereafter, the United States and the Tribe began exchanging letters and information and engaged in technical assistance meetings regarding the proposal.  (Doc. 44, ¶ 30; Doc. 39-2 at 7–50.)

On August 2, 2021, the Tribe passed a second resolution, Resolution No. DOI-177, which stated "the Tribe intends to assume responsibility of the Program management and Telecommunications through a PL 93-638 contract."  (Doc. 39-2 at 51–52.)  The Tribe also issued a corresponding Letter of Intent dated August 6, 2021, which stated the Tribe was in the planning phase "for future assumption of [BIA-OJS] Program Management component and Telecommunications component through a self-determination contract."  (*Id.* at 53.)  Among other items, the Tribe asked for funding information for each program component for fiscal years 2021, and 2022.  (*Id.*)  On September 1, 2021, the Tribe submitted the Resolution and Letter of Intent to the United States.  (*Id.* at 54–55.)

On November 30, 2021, the United States provided a substantive response to the Tribe's Letter of Intent and Resolution.  (*Id.* at 56–119.)  The United States

stated that the 2021 Secretarial amount for the Telecommunications budget was $269,871 and the Program Management budget was $319,652. (*Id.* at 56.) The United States stated it could not provide figures for fiscal year 2022 because the BIA was operating under a continuing resolution. (*Id.*) The budget worksheets attached to the letter, however, showed that expenditures for the Telecommunications component in 2021 were actually $381,409, which was $111,538 over the budgeted amount. (*Id.* at 58.) The Program Management expenditures in 2021 were actually $83,480, which was $236,082 under the budgeted amount. (*Id.* at 59.)

As these communications were ongoing, the parties settled their 2020 lawsuit regarding the Criminal Investigation component on November 26, 2021. (Doc. 44, ¶ 28.) Then, and on February 14, 2022, the United States and the Tribe executed a self-determination contract for a total amount of $453,717 for the Tribe to assume the Criminal Investigation function for the Reservation, to be known as the Northern Cheyenne Investigation Service ("NCIS"). The Annual Funding Agreement for the contract provided for three positions—two Investigators ($148,590.03 salary cost each) and one Investigative Specialist ($74,214.92 salary cost). (*Id.* ¶ 29.)

After entering into the Criminal Investigation contract, the Tribe submitted a self-determination contract proposal on July 25, 2022, for the Tribe to "contract the

Program Management and Telecommunications (Dispatch) programs and functions[.]" (Doc. 39-2 at 120–56.)  The Tribe requested $888,801.15 for the first year of the contract, consisting of $360,333.66 for Program Management and $528,467.49 for Telecommunications.  (*Id.* at 124.)  The Tribe's proposed Scope of Work indicated that NCIS would oversee both the Program Management Component and the Telecommunications Component, and would "work in partnership with the enforcement functions retained by the Bureau on the Reservation (including Uniform Patrol and Corrections)[.]"  (*Id.* at 132.)  Under the Tribe's proposal, 1 Supervisory Criminal Investigator, 7 telecommunications operators, and 1 office manager would be added to the NCIS' preexisting staff of 2 Criminal Investigators and 1 law enforcement specialist.  (*Id.* at 133.)

Accordingly, under the Tribe's proposal, it would assume control over the Program Management and Telecommunications components, as well as the Criminal Investigations function it had previously assumed under its lawsuit against the BIA.  The BIA would continue to provide direct services for the Uniform Police and Juvenile Corrections programs.

On August 12, 2022, the United States responded to the proposal and identified several potential declination issues.  (Doc. 40-1 at 3.)  One issue the United States identified was the Tribe's budget request of $528,467.49 for operation of the Telecommunications function was in excess of the applicable

funding level for the contract. (*Id.* at 3–5.) The United States explained the

Secretarial amount for Telecommunications was $269,871, and thus, the United

States could not approve the proposal to fund the Telecommunications Program for

$528,467.49. (*Id.*) The United States, therefore, directed the Tribe to submit a

revised budget and funding request for $269,871. (*Id.*)

Next, the United States addressed two potential issues with the Tribe's

proposal for the Program Management Program, and planned use of Program

Management funding for a Supervisory Criminal Investigator. (*Id.* at 4.) First, the

United States explained that the Supervisory Criminal Investigator position

identified in the proposal was not funded with Program Management dollars. (*Id.*)

The United States stated that since the Tribe "has already contracted and received

all funding the Tribe is entitled to receive for Criminal Investigations operations [],

this would not be a contractible component under Program Management funding."

(*Id.*)

Second, the United States stated the Tribe "already received the share of the

BIA Program Management funding ($76,632) related to the Criminal

Investigations function when the Criminal Investigations contract was

issued/awarded." (*Id.*) The United States explained the remaining amount of the

Program Management funding ($242,930) was "funding to provide administrative

support for the uniform patrol operations, juvenile corrections, and dispatch

operations[.]" (*Id.*) The United States indicated, however, that the "portion of this funding that supports dispatch operations may be available to the Tribe in its proposal to contract dispatch operations." (*Id.*) The United States directed the Tribe to "[s]ubmit a revised proposal without a budget request for funding direction operation of Program Management/Supervisory Criminal Investigator," and to contact the BIA Special Agent in Charge to discuss potential funding for administrative support of the dispatch operations function that the Tribe proposed to contract. (*Id.*)

The Tribe responded to the United States by letter dated August 30, 2022. (*Id.* at 8–32.) Regarding the Telecommunications Program budget, the Tribe pointed out that based on the budget data the United States provided to the Tribe on November 30, 2021, the amount actually spent on Telecommunications in fiscal year 2021 was $381,409. (*Id.* at 9.) The Tribe therefore argued that the Secretarial amount must be a minimum of $381,409. (*Id.*) The Tribe further argued that the United States must ensure the Secretarial amount "is sufficient for the Tribe <u>to actually operate the program</u>," and thus, asked the United States to negotiate amounts such that the Tribe could provide high-quality dispatch services. (*Id.* at 10 (emphasis in original).)

Next, as to the Program Management component, the Tribe asked the United States to clarify how the Supervisory Criminal Investigator position shown on its

organizational charts was funded, if it was not funded through Program Management. (*Id.* at 11.)  The Tribe also asked for revised budget information for fiscal year 2022 to verify that only a portion of the Program Management funding was contractable to support the Telecommunication function. (*Id.* at 12.)

Finally, the Tribe stated that "[r]egardless, it was the Tribe's intent to contract all the Program Management function and its associated budget and positions." (*Id.* (emphasis in original).)  The Tribe further clarified that "[i]f Program Management includes supporting the patrol division, then the Tribe wishes to contract that as well." (*Id.*)  The Tribe then asked for a complete and up-to-date scope of work for the BIA Program Management function and organization chart, so it could update its proposal. (*Id.*)

On October 6, 2022, the United States responded to further clarify the potential declination issues. (*Id.* at 33–37.)  Regarding the Telecommunications Program, the United States agreed to provide the Tribe with the requested amount of $528,467.49 to operate the Telecommunications/Dispatch function. (*Id.* at 34.)  The United States stated the parties agreed that funding at that level would resolve the issue and would no longer result in declination. (*Id.*)  The letter did not elaborate on how the United States planned to fund the full $528,467.49 amount.

As to the Program Management component, the United States clarified that the Supervisory Criminal Investigator position under the Program Management

Component was actually the Northern Cheyenne Chief of Police position, and was funded through the Uniformed Police funding budget. (*Id.* at 34.) Therefore, the United States stated there is no funding allocated within Program Management to fund a Supervisory Criminal Investigator. The United States also repeated that the Tribe had already received its share of the Program Management funding related to the Criminal Investigations function, in the amount of $76,632, when the contract for Criminal Investigations component was awarded pursuant to the parties' settlement in February 2022. (*Id.*)

The United States stated the remaining Program Management funding provided administrative support for the BIA direct service uniformed patrol, juvenile corrections, and dispatch operations. (*Id.*) The United States then reiterated that the portion of the funding that supported dispatch operations was potentially available to the Tribe. (*Id.*) But the United States stated, "[t]he portion of program management funding that supports uniformed patrol and juvenile corrections would be funding retained for the operation of the direct service uniformed patrol and corrections functions." (*Id.* at 35.)

On December 16, 2022, the United States provided further clarification about the funding of the Telecommunications function. (Doc. 39-2 at 170–71.) The United States stated that the fiscal year 2022 funding amounts for Telecommunications was $275,164 and for Program Management was $325,829.

(*Id.* at 170.)  The United States explained that in order to meet the Tribe's request for $528,467.49 for the Telecommunications function, it took $253,303.49 from the funding for Program Management, and reallocated it to the Telecommunications function.  (*Id.* at 171.)  As a result, the United States said the remaining funding for the Program Management function was $72,525.51.  (*Id.*)  The United States further stated that "[t]he remaining $72,525.51 is not available to the Tribe under the ISDEAA, as it funds the BIA OJS administrative support staff person for the remaining BIA OJS Northern Cheyenne law enforcement programs that the BIA OJS provides the Tribe through direct service, namely the BIA Uniformed Police and the BIA Juvenile Corrections program."  (*Id.*)

On February 6, 2023, the Tribe addressed the United States' position that only $72,525.51 remained allocated to Program Management and was not available to the Tribe.  (Doc. 1-10 at 2–3.)  The Tribe stated that "[a]s detailed in our July 25, 2022 self-determination contract proposal, the Tribe is requesting to contract the Program Management function **including any and all positions within that function**.  The Tribe reiterates its intent to contract for the Law Enforcement Assistant position that is part of the Program Management function."  (*Id.* at 2 (emphasis in original).)  The Tribe also pointed out that its August 30, 2022, letter stated that "it was the Tribe's intent to contract all the Program Management function and its associated budget and positions . . . . If Program

14

Management includes supporting the patrol division, then the Tribe wishes to contract that as well." (*Id.*)

The Tribe further expressed its belief that the United States was not negotiating in good faith. (*Id.*) The Tribe noted that it appeared the United States had defunded the Program Management function after the Tribe requested to contract that function by transferring $253,303.49 from the Program Management budget to the Telecommunications budget. (*Id.* at 3.) The Tribe concluded by reasserting "its request to contract any and all positions within the Program Management function." (*Id.*)

On March 23, 2023, the United States responded to the Tribe's defunding allegation. (Doc. 39-2 at 172.) The United States indicated it has authority to shift funds between its direct service programs, and it did so to meet the Tribe's requested funding level for the dispatch function. (*Id.*) The United States further stated that the $72,525.51 remaining Program Management funding was not available to the Tribe as it funded an administrative support staff person for the remaining direct service programs BIA provides the Tribe. (*Id.*)

On August 31, 2023, the United States formally approved in part, and declined in part, the Tribe's proposal. (*Id.* at 173–76.) The United States approved the Tribe's assumption of the Telecommunications and Dispatch services program, and agreed to provide the requested amount of $528,467.49. (*Id.* at 173.) But the

United States declined the Tribe's proposal to contract the Program Management

Services Function.  (*Id.* at 174–75.)  The cited statutory grounds for the declination

were: (1) "the service to be rendered to the Indian beneficiaries of the particular

program or function to be contracted will not be satisfactory under [25 U.S.C. §

5321(a)(2)(A)]"; (2) the amount of funds proposed under the contract is in excess

of the applicable funding level for the contract under [25 U.S.C. § 5321(a)(2)(D)]";

and (3) "the Program Management proposal is beyond the scope of the ISDEAA

under [25 U.S.C. § 5321(a)(2)(E).]"  (*Id.* at 175.)

As to the second grounds provided, the United States explained that the

Tribe's proposal exceeded the applicable funding level for the contract because the

Tribe proposed a budget request of $360,333.66 for Program Management to fund

an administrative position and a Supervisory Criminal Investigator.  (*Id.* at 175.)

The United States stated there was no funding allocated with Program

Management funding for a Criminal Investigator or Supervisory Criminal

Investigator, and that the Tribe already received a share of the Program

Management funding for administrative support functions when the Tribe was

awarded its contract for Criminal Investigations.  (*Id.*)

Regarding the final reason, the United States stated the proposal was beyond

the scope of the ISDEAA because the "remaining program management funding

retained by BIA OJS is required to provide administrative support for the BIA OJS

direct service uniformed patrol and juvenile corrections." (*Id.*)  The United States stated this was "a function that cannot be transferred to another BIA OJS Agency nor can it be completed by the Tribe due to the BIA LEA function for BIA law enforcement is specific to Federal Employees.  The funding for this function cannot be separated out as it would not provide enough funding for the requirements to be carried out on either the Tribal or BIA OJS side." (*Id.*)

On September 19, 2023, the Tribe requested a formal conference under 25 C.F.R. § 900.154.  (*Id.* at 177–78.)  The Tribe stated that the declination letter did not accurately describe the Tribe's proposal or the Tribe's subsequent modification of the proposal.  (*Id.* at 177.)  The Tribe asserted the objection to the requested funding amount of $360,333.66 under § 5321(a)(2)(D) had previously been resolved because the "Tribe modified its proposal to contract the available position and funding." (*Id.*)  The Tribe also argued the United States' stance that the support staff position could not be contracted was not a lawful declination reason under § 5321(a)(2)(E).  (*Id.*)  The Tribe asserted that the administrative support staff role was clearly contractable.  (*Id.*)

An informal conference was held on October 18, 2023.  (*Id.* at 179–81.)  The BIA's informal conference report dated November 3, 2023, concluded that the Tribe's proposal to contract the Program Management component was properly declined.  (*Id.*)

Thereafter, the Tribe filed this action on May 7, 2024.  (Doc. 1.)  The parties have now filed cross motions for summary judgment.  (Docs. 33, 37.)

The Tribe argues the United States violated the ISDEAA by declining the Tribe's proposal to contract the Program Management function for reasons not authorized by 25 U.S.C. § 5321, and by failing to adequately support the declination as a matter of law.  The Tribe further argues the United States violated the ISDEAA by failing to negotiate with the Tribe in good faith.  The Tribe seeks a declaration that its contract proposal be deemed approved, the Secretarial amount be set at $325,820 annually, and the United States be ordered to enter into a self-determination contract with the Tribe for the Program Management function.  The Tribe also requests equitable relief in the form of a retroactive award equivalent to the amount of contract funding the Tribe would have received had the Tribe's contract proposal been approved on August 21, 2023.  (Doc. 33.)

The United States argues the Tribe's contract proposal for the Program Management function was properly declined.  The United States asserts the Tribe's proposal requested duplicative funding, sought funding for a position that does not exist under OJS's operation of Program Management, and sought to contract for positions that cannot lawfully be carried out by the Tribe.  The United States argues, therefore, that it is entitled to summary judgment.

/ / /

18

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party.  *See Matsushita*, 475 U.S. at 587.

## III.   DISCUSSION

### A.   Analysis

Both motions for summary judgment ultimately turn on whether the United States lawfully declined to contract the BIA's Program Management function, or some part thereof, to the Tribe under the ISDEAA.  As outlined above, the United States' declination letter cited three reasons for declining the Tribe's contract proposal.  The Court will address each in turn.

/ / /

### 1.    Ground One: The Service Would Not be Satisfactory Under 25 U.S.C. § 5321(a)(2)(A)

The United States stated that under the Tribe's proposal, "the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory under subsection (a)."  (Doc. 39-2 at 174–75.) The United States did not, however, provide any further explanation of this reason for declination in the letter.  Without some explanation, merely reciting the statutory language is insufficient.  *See Cheyenne River Sioux Tribe*, 496 F. Supp. 2d at 1068 ("Simply reciting the declination criteria is absolutely insufficient.  The law requires a detailed explanation of the Secretary's rationale for his decision[.]"); *Spirit Lake Tribe v. Acting Great Plains Reg'l Dir.*, 71 IBIA 97, 2025 WL 2110707, at *98 (July 17, 2025) ("BIA must issue a written decision that clearly explains the reasons for the declination and may not merely recite the ISDA declination criteria[.]").

Accordingly, the Court finds the United States did not meet its burden to clearly demonstrate the first declination criteria exists.

### 2.    Ground Two: The Amount of Funds Proposed Exceeds the Applicable Funding Level Under 25 U.S.C. § 5321(a)(2)(D)

The second reason the United States cited for declining the Tribe's proposal to contract the Program Management function was that "the amount of funds proposed under the contract is in excess of the applicable funding level for the

contract under subsection (d)." (Doc. 39-2 at 175.)

In the declination letter, the United States noted the Tribe had requested $360,333.66 under Program Management to fund a Supervisory Criminal Investigator position and an administrative position. The letter explained there was no funding appropriated or allocated within Program Management for a Supervisory Criminal Investigator. (*Id.*) In other words, the secretarial amount of Program Management funds for a Supervisory Criminal Investigator was zero, and therefore the Tribe's proposed funding exceeded that amount. The letter also explained that the Tribe already received a share of the Program Management funding for administrative support when it was awarded its current 638 contract for Criminal Investigations. (*Id.*)

In previous correspondence, however, the United States had explained that it reallocated $236,082 from Program Management to Telecommunications to meet the Tribe's requested Telecommunications budget, and only $72,525 remained in the Program Management budget for a Law Enforcement Assistant position.[2]

The Tribe argues even if its proposed contract amount of $360,333.66 exceeded the secretarial amount, the $72,535 that remained in the Program

---

[2]  The United States contends the remaining sum was not available for contracting because the services or activity were beyond the scope of the ISDEAA. But whether the Tribe could lawfully contract for the Law Enforcement Assistant position which was funded by the remaining $72,525 is a separate issue discussed under the third ground for declination.

Management budget to fund a Law Enforcement Assistant position should have been available to the Tribe. The Tribe asserts it revised its original proposal during the technical assistance process to modify its request for funding for a Supervisory Criminal Investigator position. Instead, the Tribe proposed to contract for whatever funding and positions were left in Program Management, including the Law Enforcement Assistant position supporting BIA direct service. Thus, the Tribe asserts the United States could not validly decline the Tribe's proposal to contract for the remaining Law Enforcement Assistant position and associated funding based on exceeding the secretarial amount under 25 U.S.C. § 5321(a)(2)(D).

The United States disputes that the Tribe proposed to contract for the Law Enforcement Assistant position that was retained in the Program Management budget. The United States argues the Tribe's proposal only sought to contract for Program Management to fund positions in the Tribe's Criminal Investigation and Telecommunications programs. The United States further argues the Tribe never formally submitted a revised proposal to provide administrative support to BIA's direct services, and that the Tribe could not amend its proposal absent mutual agreement.

The record supports the Tribe's position. The Tribe's initial proposal was broadly worded, stating the Tribe "proposes to contract the Program Management

22

and Telecommunications (Dispatch) programs and functions of the Bureau of Indian Affairs – Office of Justice Services, District V, which serves the Northern Cheyenne Tribe[.]" (Doc. 39-2.) The Tribe initially proposed that the Program Management component include a Supervisory Criminal Investigator and Office Manager. (*Id.* at 134.) But during the technical assistance process, the Tribe was advised that Program Management does not fund a Supervisory Criminal Investigator position. The Tribe, therefore, clarified on August 30, 2022, that it intended "to contract all the Program Management function and its associated budget and positions . . . If Program Management includes supporting the patrol division, then the Tribe wishes to contract that as well." (Doc. 40-1 at 12.) On February 6, 2023, the Tribe reiterated that it was "requesting to contract the Program Management function **including any and all positions within that function**" and that it intended "to contract for the Law Enforcement Assistant position that is part of the Program Management function." (Doc. 1-10 at 2 (emphasis in original).) Thus, the Tribe's correspondence to the BIA makes clear the Tribe did intend to contract the entirety of the remaining Program Management function.

Nevertheless, the United States failed to acknowledge the statements the Tribe made regarding its intent to contract the entirety of the remaining Program Management function, and now argues that it did not agree to a modification of the

23

Tribe's proposal.  But by simply ignoring the Tribe's stated intent, the United States failed to meet its obligation to assist the Tribe in developing the contract proposal, and to provide assistance to overcome stated objections.  25 U.S.C. § 5321(f); 25 C.F.R. § 900.28.  As a result, it appears the parties were never on the same page regarding the scope of the Tribe's proposal for Program Management.

The United States, therefore, cannot meet its burden to clearly demonstrate the second declination criteria exists.  If the Tribe's modified proposal was to contract for all of the Program Management function with its remaining budget and positions, the Tribe's modified request would not have exceeded the remaining secretarial amount of $72,525.

### 3.    Ground Three: The Program Management Proposal is Beyond the Scope of the ISDEAA Under 25 U.S.C. § 5321(a)(2)(E).

The final reason the United States cited for declining the Tribe's proposal to contract the Program Management function was that "the Program Management proposal is beyond the scope of the ISDEAA under subpart (e)."  (Doc. 39-2 at 175.)  The declination letter explained as follows:

> The remaining program management funding retained by BIA OJS is required to provide administrative support for the BIA OJS direct service uniformed patrol and juvenile correction.  This is a function that cannot be transferred to another BIA OJS Agency nor can it be completed by the Tribe due to the BIA LEA function for BIA law enforcement is specific to Federal Employees.  The funding for this function cannot be separated out as it would not provide enough funding for the requirements to be carried out on either the Tribal or

24

BIA OJS side.

(*Id.*)

The ISDEAA permits the Secretary to decline a contract proposal if the proposed program, function, service, or activity is beyond the scope of the ISDEAA "because the proposal includes activities that cannot lawfully be carried out by the contractor."  25 U.S.C. § 5321(a)(2)(E).  Administrative functions that support the programs, services or activities that are contracted under the ISDEA are generally contractable, without regard to the organizational level within the Department that carries out such functions.  *Id.* § 5321(a).  But certain "inherent Federal functions" that may only be performed by federal employees may not legally be delegated to an Indian tribe, and are therefore, subject to exclusion from the scope of a 638 contract.  *Id.* §§ 5361(6); 5363(k).

The United States argues the retained Law Enforcement Assistant position performs inherent federal functions, and therefore cannot be contracted to the Tribe.  For example, the United States argues the duties of the Law Enforcement Assistant position include management of federal contracts, the acquisition and disposition of federal personal property, and the control and disbursement of federal appropriations.  The United States further argues that because the position provides administrative support for direct service law enforcement, the duties include issuance, transfer, inventory, disposal and reporting lost federal firearms

and ammunition, which must be performed by federal employees.  Finally, the United States asserts that only individuals who are federal employees can take part in the management of federal funds under the Antideficiency Act.

The problem with the United States' argument, however, is that this reasoning was not expressly set out in the declination letter.  The explanation given in the declination letter is somewhat vague and does not identify *why* the Law Enforcement Assistant position was "specific to Federal Employees"; or more specifically, why it would be unlawful to contract the position to the Tribe.

In *The Paiute Indian Tribe of Utah v. Southern Paiute Agency Superintendent, Bureau of Indian Affairs*, 46 IBIA 285, 2008 WL 1902819, at *292–93 (March 12, 2008), the Interior Board of Indian Appeals determined the BIA had failed to meet its burden to clearly demonstrate the validity of an ISDEAA declination based on an alleged inherent federal function.  There, a tribe had proposed to contract for realty services and sought funding from the BIA's Realty Services budget.  *Id.* at *286.  The BIA had partially declined the funding proposal on grounds that it needed to retain a portion of the funding for a Realty Specialist position, which performed certain realty functions that were federal responsibilities and noncontractible.  *Id.* at *287.  Upon review, the Board held the BIA did not clearly demonstrate that the retained funds were used to perform noncontractible functions.  The Board explained the BIA "gave no specific

examples of how, if it at all," any inherently federal functions would be performed by the Realty Specialist position. *Id.* at \*292–93. Although the decision is not binding on this Court, its analysis is persuasive.

Similar to *Paiute*, the declination letter here stated the retained funding was needed to provide administrative support functions that were specific to Federal employees. But, like *Paiute*, the letter did not give any specific examples of what those functions were or how they were inherently federal. The United States cannot fill that void now by relying on post-hoc justifications. *Pyramid Lake*, 70 F. Supp. 3d at 542, 544 (explaining that arguments which were not included in the declination letter cannot be used to support the Secretary's motion for summary judgment); *Cheyenne River Sioux Tribe*, 496 F. Supp. 2d at 1068.

Therefore, the declination letter, on its face, fails to clearly demonstrate that the Law Enforcement Assistant position performed functions that cannot be lawfully carried out by the Tribe. As a result, the United States cannot meet its burden to show the third declination criteria exists under § 5321(a)(2)(E).

The Court, therefore, finds the United States violated the ISDEAA in denying the Tribe's Program Management contract proposal.

### 4.    Requirement to Negotiate in Good Faith

In addition to challenging the three reasons cited in the declination letter, the Tribe argues the United States violated the ISDEAA by failing to negotiate in good

faith.  The ISDEAA requires the Secretary to negotiate contracts and funding agreements in good faith at all times in order to maximize the implementation and policy of tribal self-determination.  25 U.S.C. § 5321(f).

The Tribe asserts the United States did not act in good faith when it intentionally defunded the Program Management function after the Tribe submitted the contract proposal by taking the Program Management funds to pay for the Telecommunications function.  The Tribe argues the ISDEAA restricts the Secretary's discretion to re-allocate funding once a tribal proposal to contract the funding has been received.  Thus, the Tribe asserts the full amount of at least $325,829 should have been available to the Tribe for the Program Management function.  The Tribe cites *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 542 (D.D.C. 2014) in support of its argument.

The United States counters that Program Management was not defunded, but rather the funding was permissibly reallocated to meet the Tribe's request for Telecommunications funding.

In *Pyramid Lake*, a tribe submitted a contract proposal under the ISDEAA to contract with Indian Health Services ("IHS") to operate an emergency medical services program.  70 F. Supp. 3d at 537.  After receiving the tribe's proposal, IHS discontinued the emergency medical services program.  *Id.*  IHS then declined the tribe's proposal on grounds that the amount the Secretary would have provided for

28

the program was zero, and as a result the proposed funding exceeded that amount. *Id.* at 543.

The district court held IHS "was not permitted to decline the proposal under [§5321(a)(2)(D)] based on a subsequent cancellation of the program." *Id.* The court explained that in light of the "structure and purpose of the ISDEAA . . . the applicable funding level for a contract proposal is to be determined from the date the agency receives the tribe's proposal." *Id.* The court noted that otherwise, an agency could easily circumvent the carefully constructed declination criteria in the ISDEAA "whenever it wished by cancelling a program after receiving a self-governance proposal and then declining the proposal." *Id.*

This case is similar to *Pyramid Lake* in that the applicable funding level for the proposed program was reduced after the Tribe submitted its proposal. And like in *Pyramid Lake*, the Tribe's proposal was declined in part because the requested funding exceeded the adjusted funding level. But *Pyramid Lake* is distinguishable in a key aspect. There, the IHS cancelled and completely defunded the proposed program. Thus, the funds were unavailable to the tribe. Here, in contrast, the United States did not cancel the Program Management function. Nor did it reallocate the Program Management funding such that that the funds were made unavailable to the Tribe. Rather, the Tribe was advised that a portion of the funding allocated to Program Management that supports dispatch operations may

29

be available to the Tribe to support the Telecommunications functions.  (Doc. 40-1 at 4.)  Then, to meet the Tribes requested funding for Telecommunications, the BIA supplemented the program with an additional $253,303.49 that had been allocation to the BIA's Program Management program.  Thus, the Tribe still obtained the funding, albeit under a different program function.

The Court, therefore, finds the United States did not violate the good faith requirement under the ISDEAA by reallocating the Program Management funding to the Telecommunications function.

## B.    Remedy

The Tribe argues that when a federal agency unlawfully declines a contract proposal, the remedy is to order the agency to fully fund the proposal.  The Tribe, therefore, requests the Court to order the United States to reverse the August 21, 2023, declination and enter into a self-determination contract with the Tribe with an annual funding amount of at least $325,829.  The Tribe further requests, as a form of equitable restitution, a retroactive award of funding which it would have received had the proposal been approved on August 21, 2023.  The United States argues if the Court finds in favor of the Tribe, the appropriate remedy is remand.

The ISDEAA provides that in an action brought under the Act, "district courts may order appropriate relief," which includes:

> money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter or

30

> regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 5331(a).

Courts have taken different approaches to determining what remedy to apply when a contract proposal has unlawfully been declined under the ISDEAA. In *Navajo Health Foundation-Sage Memorial Hospital v. Burwell*, 256 F. Supp. 3d 1186, 1224–36 (D.N.M. 2015), for example, the United States District Court for the District of New Mexico determined the IHS violated the ISDEAA when it declined a tribe's proposal to renew an existing contract. The court, therefore, deemed the proposed renewal approved. *Id.* at 1237. The court stated that the "ISDEAA's text and its legislative history demonstrate that the court's sole remedy when a federal agency unlawfully declines [a] contract proposal is to order the agency to fully fund the proposal." *Id.* The court explained that unless federal agencies were required to fully fund the tribe's proposal, "the ISDEAA would have no teeth" and "there would be no reason for the agencies to ever approve a successor contract proposal." *Id. See also Spirit Lake Tribe*, 71 IBIA 97, 2025 WL 2110707, at *1 (determining that because the "BIA has not clearly demonstrated that the reason for the partial declination is legally sound, the Tribe's proposal is 'deemed approved' and the Secretary shall award the contract in

full[.].").

But other courts, including this district, have remanded matters to the agency for further negotiations. In *Northern Arapaho Tribe v. LaCounte*, 2017 WL 2728408 (D. Mont. June 23, 2017), a tribe submitted a 638 contract proposal for judicial services, among other programs. The court found the BIA had not sufficiently stated its reasons for declining the tribe's judicial services contract proposal. *Id.* at *5. In discussing the appropriate remedy, the court determined it was "appropriate to remand this proposal back to the BIA for reconsideration," and directed the BIA to "explain more accurately and fully any reasons for its declination" in the event it declined the proposal again. *Id.*

The Court explained that remand "represents the usual administrative law remedy in the absence of special circumstances." *Id.* (citing *Citizens to Preserve Overton Park v. Volpe*, 401 US. 402, 420 (1971)). The court indicated that approving the contract by operation of law would only be appropriate in a situation where there was an "already-executed mature contract." *Id.* The court reasoned that in such a scenario, approving the contract by operation of law would "simply reflect[] the tribe's right to continued funding for costs incurred under an already existing contract." *Id.* But where the Tribe seeks funding for a new function, remand is appropriate. *Id.*

/ / /

32

Similarly, in *Pyramid Lake*, the court held that although it found the Secretary violated the ISDEAA in denying a tribe's contract proposal, "it will not direct [the Secretary] to enter into the Tribe's contract at the 2012 amount." 70 F. Supp. 3d at 545. Rather, the court directed the Secretary to further negotiate with the tribe over the appropriate secretarial amount. *Id.*

The Court finds the approach adopted by the courts in *Northern Arapaho Tribe* and *Pyramid Lake* is appropriate in the circumstances of this case. As in those cases, the Court is not presented with a contract renewal that was declined, but rather a new contract proposal. As such, the Court lacks adequate information to properly assess issues such as what the appropriate secretarial amount should be, and whether the Law Enforcement Assistant position in fact performs inherently federal functions that would be unlawful to contract to the Tribe.

Additionally, the Tribe argues that it modified its original proposal for the Program Management to simply contract for whatever positions and associated budget that remained under that function. It appears the remaining budget would be limited to $72,525.51, not the original budget of $325,829. As discussed above, the United States failed to acknowledge the Tribe's expressed intent to contract the entirety of the Program Management function, including the Law Enforcement Assistant position. The agency, therefore, is in a better position to work with the Tribe to clarify the precise scope of the proposed Program Management contract,

33

and to assess whether the residual funding within the Program Management function can be awarded to the Tribe.

Therefore, the Court will recommend this matter be remanded to the agency for further action.

## IV.   CONCLUSION

Based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.      The Tribe's Motion for Summary Judgment (Doc. 33) be **GRANTED in part**.  The BIA's declination of the Tribe's proposed Program Management contract should be reversed, and the matter remanded to the agency for re-consideration consistent with this opinion.

2.      The United States' Motion for Summary Judgment (Doc. 37) be **DENIED**.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

DATED this 29th day of June, 2026.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge